IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUL 2 5 2002

CLERK

DEBRA K. WILLIAMS,

    Plaintiff,

vs.

                No. CIV 01-912 BB/LFG

JO ANNE B. BARNHART,
Commissioner, Social Security Administration,

    Defendant.

### MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff Debra K. Williams ("Williams") invokes this Court's jurisdiction under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Williams was not eligible for supplemental security income ("SSI") benefits. Williams moves this Court for an order reversing the Commissioner's final decision or, in the alternative, remanding for a rehearing.

#### Factual Summary and Procedural History

Williams was born on June 13, 1957 and was 42 years old at the time of the administrative hearing in this matter. She has a GED and attended college for approximately one year. She worked in the past as a fork lift operator, assistant supervisor in a cheese plant, and fast food cook.

---

[1]Within ten (10) days after a party is served with a copy of the legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.



Williams applied for SSI in February 1998, alleging severe depression, and chest and back pain. Her application was denied initially and on reconsideration, and on June 28, 1999, she submitted a request for hearing before an Administrative Law Judge ("ALJ"), in which she stated that she recently learned she had Hepatitis C. The hearing was held on March 21, 2000. The ALJ issued his opinion on July 10, 2000, finding that although Williams could not return to her past work, she is able to do other work that exists in significant numbers in the national economy and therefore is not disabled. Williams filed an appeal with the Appeals Council, which denied her request for review on June 8, 2001. This appeal followed.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five. If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .;"[5] at step three,

_____

[2]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2000); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f)(2000); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. §§ 404.1520(b), 416.920(b)(2000).

[5]20 C.F.R. §§ 404.1520(c), 416.920(c)(2000).

the Commissioner must conclude the claimant is disabled if she proves that these impairments meet

or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

1[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical

and mental demands of her past relevant work.[7]

If the claimant is successful at all four of the preceding steps, the burden shifts to the

Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8]

age, education and past work experience, she is capable of performing other work.[9] If the

Commissioner proves other work exists which the claimant can perform, the claimant is given the

chance to prove she cannot, in fact, perform that work.[10] In the case at bar, the ALJ made his

dispositive determination of non-disability at step five of the sequential evaluation.

Williams contends that the final administrative decision is not supported by substantial

evidence, that the Commissioner did not carry the applicable burden of proof, and that the

Commissioner did not apply the correct legal standards.

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by

---

[6]20 C.F.R. §§ 404.1520(d), 416.920(d) (2000). If a claimant's impairment meets certain criteria, that means her impairments are "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. §§ 404.1525(a), 416.925(a) (2000).

[7]20 C.F.R. §§ 404.1520(e), 416.920(e) (2000).

[8]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. §§ 404.1567, 416.967 (2000).

[9]20 C.F.R. §§ 404.1520(f), 416.920(f) (2000).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992; Muse, at 789. In Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects. [Citations omitted].

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Williams claims the ALJ erred in finding Williams to be not entirely credible, and erred in holding that she can perform a wide range of non-public, sedentary work.

## Discussion

### A. The ALJ's Opinion

In his opinion, the ALJ found that Williams' "allegations regarding her limitations are not totally credible." [Tr. 17]. This finding is supported by substantial evidence.

The ALJ noted that the medical evidence indicates that Williams has arthralgias (joint pain), history of Hepatitis C, obesity, history of peptic ulcer disease, a major depressive disorder, and a history of substance abuse. He found that her impairments are severe but that they do not

meet or equal any of the Listings. [Tr. 13-14]. Williams does not contest this finding. The ALJ then found that Williams cannot return to her past relevant work, but that she does retain the residual functional capacity to perform other work existing in significant numbers in the national economy. In making this finding, the ALJ summarized the medical evidence of both physical and mental impairments.

With regard to Williams' mental impairment, he noted that the assessments by State agency physicians indicated that Williams had a severe mental impairment under Sections 12.04 (affective disorders) and 12.09 (personality disorders), which produced a moderate difficulty in maintaining social functioning, and one episode of deterioration or decompensation in a work setting, and that these limitations are documented in Williams' medical record.

The ALJ went on to note, however, that, "the medical and other credible evidence of record fails to indicate that the claimant has significant problems with attention or concentration," that although she has had sporadic treatment for depression, she failed to follow up with medication evaluation and appointments, and that the overall assessment of the examining psychologist was that Williams' depressive problems were a reaction to the fact that her four sons were incarcerated and she had recently separated from her partner. [Tr. 15]. The ALJ further found no evidence in the medical record of significant panic attacks or other psychological problems and stated that the wide variety of acute medical problems for which Williams has been treated are of the sort which respond to time and treatment, and that her medical records display a history of non-compliance with treatment. [Id.].

He noted further that although there are some questions in the record regarding Williams' ability to interact with coworkers or supervisors, "in limiting the claimant's ability to socially

interact with coworkers and supervisors, the Administrative Law Judge finds that the claimant could interact with coworkers and supervisors but would have difficulty with significant social interaction, such as working on a team or interacting significantly to perform work related activities." [Tr. 15-16]. He held that there was no medical or other credible evidence establishing that Williams is completely incapable of interacting with others. [Tr. 16].

With regard to Williams' physical impairments, the ALJ noted that the medical record indicated that Williams "tends to be treated for acute gastrointestinal or upper respiratory problems which respond somewhat to time and treatment" [Tr. 15], and that she has a history of obesity and back strain which would have a tendency to limit her functional capacity. He also found that the medical record did not indicate that her history of Hepatitis C created any severe functional restrictions on her ability to perform work-related functions. He did grant "significant credibility" to Williams' statements regarding her inability to lift more than 10 pounds, and her inability to stand or sit for prolonged periods of time, without occasional change of positions. [Tr. 15].

The ALJ then found that, taking into account Williams' mental and physical impairments, she had a RFC for a wide range of sedentary to light work, with lifting and carrying up to 10 pounds and the ability to perform prolonged walking, standing, or sitting with occasional change of positions, and that she was restricted to non-public work with limited social contact with co-workers and supervisors. [Tr. 15-16].

B. Credibility Assessment

As noted above, the ALJ found that Williams' "allegations regarding her limitations are not totally credible." [Tr. 17]. With regard to Williams' mental impairment, this finding was based on his determination that, although Williams testified that she had difficulty concentrating,

6

this was not borne out by the record; that although she has a history of treatment for a depressive syndrome, she was treated only sporadically for her psychological complaints and failed to follow up with medical evaluation and appointments; that the record fails to indicate complaints or observations of significant panic attacks; and that in spite of low GAF ratings, the examining psychologist found that Williams' depressive problems were a reaction to domestic troubles, and that only brief therapy was needed to help her cope with her immediate problems. [Tr. 15]. He further found that Williams' assertions that she can't be around people and can't interact with others are contradicted by record evidence. [Tr. 15-16].

With regard to her physical impairments, the ALJ did find credible Williams' statements relating to her ability to lift only 10 pounds, and her need to change positions occasionally when sitting, standing, and walking. [Tr. 15]. Beyond these limitations, however, he held that the record failed to document significant complaints of physical medical problems, other than obesity and back strain, which would limit her functionally. He found that the gastrointestinal, upper respiratory, and Hepatitis C conditions for which she received treatment were not conditions which restricted her in performing work functions, but rather were of the acute sort which "respond to time and treatment." [Tr. 15].

These credibility findings are supported by substantial evidence. The Court will generally give deference to the ALJ's conclusions regarding a claimant's credibility and "may not disturb the ALJ's finding when the appellant's complaints . . . are not supported by the medical evidence in the record." Campbell v. Bowen, 822 F.2d 1518, 1522 (10th Cir. 1987). However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir.

1988). When the ALJ questions a claimant's credibility, he must articulate specific reasons for doing so. Kepler v. Chater, 69 F.3d 387, 391 (10th Cir. 1995).

A claimant alleging a nonexertional disability must present evidence of medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that could "reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1529(a), 416.929(a). The failure to follow a prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment. Decker v. Chater, 86 F.3d 953, 955 (10th Cir. 1966); Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990).

### 1. Mental Impairment

Williams testified at the hearing that she has problems with depression, has had panic attacks, and attempted suicide a few years ago. [Tr. 52-54]. She said she has "a problem being around people" [Tr. 37], that she gets "really nervous" around people, and that she does nothing socially other than to call her grandparents each day. [Tr. 38-43]. She stated that it is hard for her to deal with the public and that she doesn't "like to go out much around people and stuff" [Tr. 49-50], and although she said that she generally gets along with people, nevertheless, "I hate being around them." [Tr. 54].

Williams also stated that she has a problem with her memory and has difficulty concentrating, although she also said she can sit and read for an hour or so, and can concentrate on reading if there's no one else around. [Tr. 48, 52-53]. She said is taking Paxil, an antidepressant, and sleep medication, that she is seeing a therapist every two weeks [Tr. 37, 47-48], and that she has had ongoing mental treatment, for perhaps a year. [Tr. 56].

8

In a Disability Report filed February 13, 1998, Williams stated that she was severely depressed, that she had to quit her job at Dairy Queen because she would "get stressed out" and forget things. She wrote that she stays home most of the time, is scared of going out in public, cries for no reason, "can't deal with people or situations," and doesn't like to be with people because they stress her out. [Tr. 100-103]. In March 1998, she stated in her "Chest Pain History" form that her doctor told her she was "just too stressed or a nervous wreck," and this causes the pain. [Tr. 112].

In an interview in April 1998, Williams said she sometimes starts to cry when driving and has to pull over, not knowing where she is going. She said she was not seeing a doctor at the time and was not on any medication. When asked how she felt, however, she said that she felt "pretty good" that day so far. [Tr. 113]. She said that she spends her day sitting, staring, and thinking, although she sometimes goes to the movies and can follow the story line. She walks daily to the store and can deal with the clerks there. [Tr. 114]. She lives with her son and a friend, and sometimes goes to visit an "old lady friend." [Id.]. She said she sometimes attends church, although she hadn't been in about two months. [Tr. 115].

In June 1998, Williams stated in her Reconsideration Disability Report that her depression had worsened, that she couldn't seem to "get out and be around people," that she cries constantly and forgets what she is supposed to be doing, and that she wakes from sleep doesn't "know her own house." [Tr. 119].

Although the record does document Williams' problem with depression, there is evidence contradicting her statements that she can't be around people at all. She stated at the hearing that she generally gets along well with others, even though she "hates" being around people. [Tr. 54].

9

A few months after her suicide attempt in March 1996, she told a clinical therapist that she had minimal support from a small circle of friends and that she wished to increase that support. [Tr. 173]. In June 1996, she was providing day care for one child. [Id.]. In July 1996, she told a therapist that although she used to want to be in dark rooms and not see anybody, lately she had been doing better and had been visiting friends again. [Tr. 242].

In March 1998, she separated from her husband and moved in with a friend. [Tr. 110]. In April 1998, she reported that she sometimes goes out to the movies, and that she walks daily to the store and can deal with the clerks there. [Tr. 114]. She was living at that time with her son and a friend, and sometimes would go out to visit an "old lady friend" and would attend church, albeit infrequently. [Tr. 114-115]. Also in April 1998, she drove to Farmington with her sister. [Tr. 116-117]. In July 1998, she told a therapist that she is "not happy" about spending her leisure time alone. [Tr. 170]. Various medical examiners have described her as upbeat, helpful, calm and alert, cooperative, with normal mood and affect. [Tr. 115, 139, 212-213, 242].

The record also indicates that Williams' problems with depression have been situational, in reaction to various life stresses, and are of the sort which, as the ALJ put it, would respond to time and treatment. He also noted that, although she sought out sporadic treatment for a depressive syndrome, she failed to follow up with medical evaluation and appointments. [Tr. 15]. These findings are supported by the record.

Williams was hospitalized in March 1996 after overdosing on prescription drugs, in what is described in the ER notes as a "suicide gesture." [Tr. 131]. At the time, she was depressed at having recently broken up with a boyfriend, having lost her job, having been in jail, and having

two of her children run away from home. Although she denied drug use, she tested positive for street drugs. [Tr. 133-135]. She was admitted to the hospital on this occasion but left the same day, before she could be evaluated by a physician and against medical advice. [Tr. 134, 136].

On January 28, 1998, she told her doctor that she had been to the ER the preceding night with chest pain; he noted that she had been under a lot of stress, as her son was just sentenced to 24 years in jail. No treatment was indicated on this record. [Tr. 143]. In July 1998, the examining psychologist recommended that brief therapy might be indicated to help Williams "cope with immediate problems around her sons's imprisonment and her recent separation." [Tr. 171].

In the Mental RFC Assessment of August 24, 1998, the physician noted that Williams had one psychiatric hospitalization, in March 1996, for less than 24 hours following an overdose, and "[a]t that time, she was drinking, having problems at work and was recently released from jail." She had a psychiatric assessment in July 1998 and was found to have tremendous exogenous stress from a recent marital separation, employment and family and social problems, including the fact that all four of her sons were incarcerated. [Tr. 179]. The doctor concluded that Williams had no psychiatric restrictions on her activities of daily living, and "[a]lthough she can attend, concentrate and keep pace, persistence may be a problem. This is more a characterological problem than a sign of [major?] depression. She would do best in non-public work." [Id.].

The record also reflects that Williams has been non-compliant with medical and psychological treatment, a factor relevant to the credibility of her assertion that her mental impairment was disabling. Thompson v. Sullivan, 987 F.2d 1482, 1489 (10th Cir. 1993); Qualls v. Apfel, 206 F.3d 1368, 1372-73 (10th Cir. 2000). In relying on a claimant's failure to pursue treatment or take medication, the ALJ should consider (1) whether the treatment at issue would

restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse. Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987).

As noted above, Williams left the hospital against medical advice and before being evaluated, following her admission for a suicide gesture in March 1996. Her probation officer referred her to Counseling Associates in Roswell following this suicide incident [Tr. 172]. The Counseling Associates notes for June 1996 indicate an "inconsistent attendance record." [Tr. 174]. In September 1996, she failed to show up for an appointment with a physician at Counseling Associates, although she called a few days later, requesting a refill of medications. [Tr. 242]. In December 1996, she again requested medications; the note indicates "case closed, no Rx." [Tr. 241].

Williams returned to Counseling Associates in June 1998. She told the psychologist there that she had applied for Social Security but was denied because she was not receiving mental health treatments. She missed some appointments and then discontinued treatment in October of that year. [Tr. 119, 169-170, 240]. In the Mental RFC Assessment of August 1998, it was noted that Williams "did not follow through with recommended psychotherapy or medication." [Tr. 179].

In March 2000, Williams filled out a Recent Medical Treatment form, stating that she was taking medications for depression [Tr. 127], and she stated at her hearing that same month that she had been seeing doctors at Carlsbad Mental Health once a month for medications, and a psychotherapist every two weeks. [Tr. 39, 47-48]. Her medical records, however, indicate several treatments for physical problems, but she has not presented records of any mental health

treatment after October 1998.

With regard to the four factors cited in the Frey case, there is evidence that antidepressant medication and counseling, had they been pursued, would have restored Williams' ability to work. Her depression improved when she was undergoing regular counseling and taking Zoloft. She stated in June 1996 that she was feeling better since coming to Counseling Associates [Tr. 243], and in July 1996 reported that she was feeling better on Zoloft, had been sleeping better, and had begun to visit friends again and resume a more normal social life. [Tr. 242]. However, she dropped out of counseling later that year. She went back into treatment in June 1998, apparently because she had been denied benefits for lack of treatment, but she dropped out again in October of that year.

Secondly, counseling and medication were treatments that were prescribed for Williams. She was seen in the ER following the suicide attempt in March 1996, and stated that she would try to hurt herself if she left the hospital. She was admitted to the hospital at 3 p.m. for treatment but checked herself out at 11 p.m. and left against medical advice. [Tr. 131-136]. In June 1996, she was referred to Counseling Associates by her probation officer. The recommendation at that time was that she continue individual therapy, attend psychiatric clinic and possibly join a women's therapy group. She was prescribed Zoloft and felt better while taking it, and while attending therapy; nevertheless, she discontinued the program voluntarily. [Tr. 172-174, 240-244]. In a disability report of February 1998, Williams stated that her doctor had advised her to seek counseling. [Tr. 103]. In July 1998, Counseling Associates medical records include a recommendation for individual therapy and medication evaluation for symptoms of depression; however, the notes state that Williams "failed to show for her medication evaluation appointment,

13

and several subsequent attempts to contact her failed," and that she was "non-complian[t] with recommendations for treatment." [Tr. 169-171].

Third, Williams voluntarily discontinued treatment, or failed to show up for scheduled appointments, on several occasions, as described above.

Finally, Williams has given no justifiable excuse for her refusal of treatment. She contends that her inability to be around people made it impossible for her to attend counseling sessions. However, the record indicates that she does indeed go out in public, to the store and other places, and spends time with others. In addition, she was able to attend counseling sessions for several months in 1996, and again in 1998. She stated at the hearing that she is currently seeing a counselor every other week and a physician once a month (although as noted there are no medical records to document this statement).

Therefore, the Frey factors are satisfied and, in general, the ALJ's finding regarding William's credibility as to her mental impairment is well supported by the record.

### 1. Physical Impairments

As noted above, the ALJ did find credible Williams' statements relating to her ability to lift only 10 pounds and her need to change positions occasionally when sitting, standing, and walking. [Tr. 15]. However, he held that the record failed to document significant complaints of physical medical problems, other than obesity and back strain, which would limit her functionally. He found that the gastrointestinal, upper respiratory, and Hepatitis C conditions for which she received treatment were not conditions which restricted her in performing work functions, but rather were of the acute sort which would respond to treatment.

Williams argues in her memorandum that the ALJ disregarded the limitations imposed by

14

her obesity and respiratory problems on her ability to do prolonged walking and standing. This is incorrect. The ALJ noted in his opinion that "a review of the treatment record fails to document significant findings or complaints of physical problems. Rather, as noted above, the claimant tends to be treated for acute gastrointestinal or upper respiratory problems which respond somewhat to time and treatment." [Tr. 15]. He found that Williams does not have the capacity to sit, stand, and walk for prolonged periods of time unless she is able to change positions occasionally. [Id.].

Williams is between 5'4" and 5'5" tall. She weighed 254 pounds in January 1998. [Tr. 118]. She estimated her own weight to be 280 pounds, in March 1998. The ALJ considered Williams' "history of obesity and back strain" and found that these conditions would "have a tendency to limit the claimant's functional capacity." He therefore credited her testimony regarding inability to lift more than 10 pounds, and the need to change positions occasionally while sitting, standing, and walking. [Tr. 15]. This comports with the ALJ's duty to consider evidence of obesity, in combination with other conditions such as musculoskeletal, respiratory, and cardiovascular impairments:

> [W]hen determining whether an individual with obesity has a
> listing-level impairment or combination of impairments, and when
> assessing a claim at other steps of the sequential evaluation process,
> including when assessing an individual's residual functional
> capacity, adjudicators must consider any additional and cumulative
> effects of obesity.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 1.00(F), 3.00(I), 4.00(F) (2001).

The ALJ's finding, that Williams' physical problems were primarily short-term, acute episodes of gastrointestinal or respiratory complaints, is borne out by the record. From 1989

15

through 1998, her private physician saw her a number of times, for complaints such as indigestion and epigastric pain, a cyst on her finger, sore throat and congestion, cough, dizziness, pneumonia, chest pain, headache, runny nose, shoulder, neck and back pain, joint pain, itching, and cigarette addiction. [Tr. 142-145, 282-307].

In January 1996, she appeared in the ER and was diagnosed with pneumonia. She was given medications, told to drink lots of fluids and stop smoking, and to return if the condition worsened. [Tr. 137-138]. In November 1997, she visited the ER with complaints of epigastric pain and vomiting after having taken her mother's prescription to alleviate her respiratory symptoms. She was given medications and told to call her primary physician. [Tr. 309-311]. In January 1998, she visited the ER with complaints of chest pain. Physical exam and x-rays showed no sign of acute disease. She was diagnosed with chest wall strain and was given anti-inflammatory and analgesic drugs, along with an anti-anxiety agent, and told to quit smoking. [Tr. 139-141]. In January 1999, she was seen again at an ER with complaints of wheezing and asthma. X-rays revealed no acute or focal abnormality in the chest. She was given an antibiotic and inhaler and told to return if the wheezing persisted or worsened. [Tr. 272-280]. In April 1999, she was seen in the ER with complaints of coughing, chills and fever. A chest x-ray revealed no evidence of acute cardiopulmonary disease. She was diagnosed with upper respiratory infection and bronchitis, given medications and told to return if the condition had not improved in 2 or 3 days. [Tr. 250-257, 281]. She returned a few days later, still having chills and fever; she was told at that time of the positive Hepatitis C result. [Tr. 260].

From June 1999 to March 2000, she was seen from time to time at a family medical center in Carlsbad for conditions including a sinus infection, an elbow injury, and neck pain resulting

16

from an automobile accident in February 2000. [Tr. 217-236]. With respect to the automobile accident injuries, the ALJ noted:

> While testimony and other evidence in the file indicated that the claimant suffered an automobile accident in February 2000 (Ex. 12E), additional records have not been submitted which indicate that the claimant suffered any injuries which have produced severe impairments not previously noted. Thus the Administrative Law Judge cannot find that the claimant has suffered any additional injuries, impairments, or restrictions associated with her February 2000 motor vehicle accident . . .. Nevertheless, the Administrative Law Judge has considered limitations which the claimant indicated were associated with her post-motor vehicle accident condition in questioning the Vocational Expert.

[Tr. 14]. These findings regarding the automobile accident injury are supported by the record, and Williams does not contest them.

Williams stated in a disability report dated February 1998 that she has muscle tension and pain on a daily basis to the extent that she had to stop lifting things, and that she is in pain most of the time and can't even pick up her purse. [Tr. 100, 103, 105]. She stated in a chest pain history form of March 1998 that she has chest pain every day or two, that it gets worse if she presses on her chest, that it sometimes radiates to her shoulder and left arm, that it lasts at least an hour and forces her to stop whatever she is doing, as it "hurts like crazy." Any sort of activity, but particularly lifting, seems to cause the pain, which "makes it real hard for me to do anything I used to do." [Tr. 111-112]. In the reconsideration disability report of June 1998, she stated that she experienced a lot of pain in her neck and back every day. [Tr. 119]. Williams testified at the hearing that it hurts her lower back if she lifts much weight at all, but she later said she could lift a gallon of milk. [Tr. 38, 45-46]. She said she can sit for approximately 45 minutes to an hour and can walk around for 20-40 minutes. [Tr. 44].

17

Although the record indicates that Williams did see doctors from time to time with complaints of pains in the back, neck, chest, and elbow [Tr. 139-141, 210-216, 219, 235, 282, 286, 290, 291, 292, 297, 303], she was typically treated with analgesics and released. In addition, the record does not reflect that Williams has been restricted in her daily activities due to any pain-related complaints. She stated that she fixes herself breakfast, can take care of her own personal grooming needs, goes to the movie sometimes, walks to the store daily, cooks dinner sometimes, visits friends occasionally and goes to church now and then. She also cleans house, crochets, and takes care of the dog. [Tr. 41-45, 114-115].

The Court agrees with the ALJ that Williams' complaints of physical pain are not supported by medical evidence in the record, and his credibility determination will not be disturbed.

C. RFC Assessment and Finding That Claimant Can Perform Other Work

Williams argues that the ALJ erred in his findings that she retained the RFC to perform a wide range of sedentary to light work with the restrictions for non-public work and an opportunity to change positions when sitting and standing, and that there are jobs available in the national economy which she could still perform, given her RFC. The Court finds, however, that the ALJ's RFC assessment that Williams can perform jobs in the national economy is supported by substantial evidence.

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles such as small tools. A sedentary job primarily involves sitting, although a certain amount of walking and standing is often necessary in carrying out job duties. 20 C.F.R. §§ 404.1567(a); 416.967(a). Light work involves lifting no more than 20 pounds at a time, with

18

frequent lifting and carrying of objects weighing up to 10 pounds, and also requires "a good deal of walking and standing." 20 C.F.R. §§ 404.1567(b); 416.967(b).

As noted above, the ALJ found credible Williams' assertion that she cannot lift more than 10 pounds, and that she cannot walk, sit or stand for prolonged periods without changing position. He found, however, that as long as she is able to change positions, she does have the ability to sit, stand, and walk for prolonged periods and thus concluded that she has the ability to perform a wide range of sedentary to light work. [Tr. 15]. This conclusion is borne out by the record.

Although in earlier statements, Williams said she couldn't lift much of anything at all, she testified at the hearing that she is able lift a gallon of milk. Although the State agency physicians concluded that Williams could occasionally lift 50 pounds and could frequently lift 25 pounds, and that no exertional limitations were established [Tr. 160, 197], the ALJ chose to credit Williams' statement and found a 10-pound limit. Williams herself testified that she could sit for 45 minutes to an hour, that she could sit and read for an hour, that she could walk for 20-40 minutes, and that she walked daily to the store, about four blocks away. She does cooking, cleaning, and shopping duties around the house, and occasionally goes to the movies or to church. These facts support the ALJ's RFC assessment.

Vocational expert ("VE") Bertina Telles testified at the hearing. She was asked by the ALJ to assume a hypothetical person of Williams' age, education, and work experience, who was limited to non-public work, which did not involve social contact with co-workers and supervisors, and which enabled her to alter between sitting and standing, with a lifting limitation of 10 pounds. [Tr. 58-59]. He later clarified the hypothetical to "limited coworker contact," in the sense that she would not be working on a team or interacting with coworkers. [Tr. 65]. He asked whether

19

there were any jobs in the national economy that such a person could perform. [Tr. 58-59].

Given that hypothetical, the VE listed jobs including payroll and accounting clerk, which she said Williams could do given her GED and year and a half of college; and factory work such as assembly of small parts. [Tr. 59-61]. The assembly jobs are classified as light, but they could be performed as sedentary, since the worker could choose to either sit or stand. [Tr. 62]. If the hypothetical were changed to include no contact with coworkers at all, the VE said there were no jobs available with that restriction. [Tr. 65-66].

Given Williams' age, education, past work experience and RFC, and considering the testimony of the VE, the ALJ made a finding that she is capable of making a satisfactory adjustment to work that exists in significant numbers in the national economy. This finding is supported by substantial evidence. The ALJ took into account Williams' obesity and respiratory limitations, and found she had a more restricted ability in the areas of lifting, sitting, standing and walking than were found by the agency physicians. He considered her problems with social interaction in restricting her to non-public work, with limited social contact with coworkers. Williams' physical abilities, and her limited but existent capacity to interact with others, are well documented on the record, as detailed above.

The Court finds that the Commissioner met her burden at step five of showing that Williams could perform work that exists in the national economy, and the ALJ did not err in so holding.

## Recommended Disposition

That Williams' Motion to Reverse and Remand [Doc. 8] be denied and the matter be dismissed with prejudice.

Lorenzo F. Garcia
United States Magistrate Judge

**THE EXHIBITS ATTACHED TO THIS PLEADING ARE TOO VOLUMINOUS TO SCAN. SAID EXHIBITS ARE ATTACHED TO THE ORIGINAL PLEADING IN THE CASE FILE WHICH IS LOCATED IN THE RECORDS DEPARTMENT, U.S. DISTRICT COURT CLERK'S OFFICE...**